James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com

[*Additional Counsel Listed On Signature Page*]

*Counsel for Plaintiff and the putative Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEFFREY STEVENS, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| TD BANK, N.A., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Jeffrey Stevens ("Plaintiff"), on behalf of himself and all other similarly situated (the "Class Members"), brings this case against TD Bank, N.A. ("TD Bank" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

### INTRODUCTION

1.      This is a class action against TD Bank for violating Plaintiff's privacy rights under federal and state law by disclosing Plaintiff's and other consumers' personal financial information to third parties without consent.

2.      TD Bank operates a website—https://www.td.com—on which consumers can access their account information and apply for credit cards and other financial products. TD Bank tracks and records its customers' interaction with its website, including after its customers have logged in through its portal to access their confidential account information.

3.      In addition to tracking and recording its customers' interactions with its website, TD Bank also incorporated a hidden tracking code created by Meta Platforms, Inc. ("Meta") into its website. This tracking code—referred to herein as the "Facebook Tracking Pixel" or "Meta Pixel"—shares customer interactions with TD Bank's website with Meta. Meta uses the data shared by TD Bank to create custom audiences for TD Bank to use for marketing and to benefit Meta itself.

4.      The data TD Bank shares with Meta via the Facebook Tracking Pixel includes time-stamped, personally identifiable records of TD Bank customers, such as Plaintiff and other class members, including, among other things: (a) the fact that the individual is or has been one of TD Bank's customers or has obtained a financial product or service from TD Bank; and (b) information the consumer provides to TD Bank, including information related to an application to obtain a credit card or other financial product or service, and information TD Bank obtains in connection with servicing its customers' accounts.

5.      Meta combines this personal information with other information about each consumer gathered from other sources and uses it for marketing and advertising purposes.

6.      Under the Gramm–Leach–Bliley Act (GLBA), 15 U.S.C. §§ 6801, *et seq*., financial institutions, such as TD Bank, are prohibited from disclosing a consumer's "personally identifiable financial information" without advance notification and opt-out rights. The GLBA defines "personally identifiable financial information" to include, among other things, (a) any

information a consumer provides to a financial institution to obtain a financial products or service; (b) any information about a consumer resulting from any transaction involving a financial product or service; or (c) any information a financial institution otherwise obtains about a customer in connection with providing a financial product or service. The examples of "personally identifiable financial information" included in the GLBA are indistinguishable from the types of information TD Bank disclosed to Meta, including, among other things: (a) "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution]"; (b) "[a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and (c) "any information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)."

7.    TD Bank's practice of disclosing its customers' personal financial information to Meta violated Plaintiff's and other class members' privacy rights under the GLBA. TD Bank's conduct also violated other related federal and state laws. Plaintiff brings this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) of the Class Action Fairness Act because: (1) there are 100 or more putative class members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different states.

9.    Personal jurisdiction is appropriate because Defendant maintains its principal place of business in this District. Likewise, in accordance with 28 U.S.C. § 1391, venue is proper because Defendant is a resident of this District.

## DEFENDANT

10.    TD Bank has its principal place of business in Cherry Hill, New Jersey and is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A). It operates about 1,100 branches and 2,600 ATMs across the East Coast and calls itself "America's Most Convenient Bank."

11.    TD Bank charges a $5 dollar month maintenance fee for its TD Simple Savings accounts and charges a $15 monthly maintenance fee for its TD Signature Savings account.[1] Both account types offer well below industry average interest rates. For example, in July 2024, TD Simple Savings offers a 0.02% APY.[2] "The national average savings account yield was 0.6 percent APY, according to Bankrate's survey of institutions as of July 22."[3] It also charges for various other services.[4]

## NAMED PLAINTIFF

12.    Plaintiff Jeffrey Stevens is a resident of Brooklyn, New York, and a citizen of New York State for purposes of federal diversity jurisdiction. Plaintiff is a TD Bank customer. During the last three years, Plaintiff accessed his financial information maintained by TD Bank through TD Bank's website: https://www.td.com. Plaintiff had a Facebook account when Plaintiff accessed his financial information on TD Bank's online financial platform. When Plaintiff accessed his

---

[1] https://perma.cc/6M4P-G96S
[2] *Id.*
[3] https://perma.cc/8JGG-LS7G
[4] *See, e.g.*, https://www.td.com/content/dam/tdb/document/pdf/personal-banking/1-fees-en.pdf

financial information on TD Bank's online financial platform, Plaintiff was logged into his Facebook account. Through the systematic data sharing process described in this complaint, Plaintiff's interactions with TD Bank's online financial platform were disclosed to third parties, including Meta. Plaintiff did not consent to those disclosures. Plaintiff would have used another bank that paid higher interest if he had known TD Bank would share his personal information with Meta.

## **FACTUAL ALLEGATIONS**

### A.    **Facebook and the Facebook Tracking Pixel**

13.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users. Facebook describes itself as a "real identity platform," meaning users are allowed only one account and must share "the name they go by in everyday life." To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

14.    Facebook generates revenue by selling advertising space on its website.

15.    Facebook sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its site. This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections." Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.

16.    Advertisers can also build "Custom Audiences." Custom Audiences enable advertisers to reach people who have already shown interest in their business, whether they're loyal customers or people who have used their app or visited their website. Advertisers can use a

Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which leverages information such as demographics, interests, and behavior from a business's source audience to find new people who share similar qualities. Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by using Facebook's "Business Tools," which collect and transmit the data automatically. One such Business Tool is the Facebook Tracking Pixel.

17. The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Facebook Tracking Pixel tracks the people and type of actions they take. When the Facebook Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

18. Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks. Advertisers can also configure the Facebook Tracking Pixel to track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases. An advertiser can also create their own tracking parameters by building a "custom event."

19. Advertisers control how the Facebook Tracking Pixel identifies visitors. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers." HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."

20.     When a user accesses td.com while logged into Facebook, the Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID. Facebook IDs correspond to Facebook profiles.

21.     No matter the circumstances, Facebook receives at least the fr and _fpb cookies from a visitor's browser when visiting td.com. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier. The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. Facebook, at a minimum, uses the fr and _fbp cookies to identify users.

22.     The information Facebook collects from the Facebook Pixel is valuable to Meta (and TD Bank). Facebook can use the information it collects to promote safety and security on and off the Meta products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta products. Facebook can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and use the Event Data for ads delivery after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta products. Further, Facebook can use the event data to help websites like TD Bank's reach people with transactional and other commercial messages on Facebook Messenger and other Meta products. Finally, Facebook can use the information it collects to personalize the features and content (including ads and recommendations) that Facebook shows people on and off Meta products. Thus, the information is valuable to Facebook for its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

**B.    TD Bank's Website and the Facebook Pixel**

23.    TD Bank has integrated the Facebook Tracking Pixel into td.com, including into its financial platform and online credit application process, and it is configured to transmit to Meta: (a) information which identifies the specific consumer using TD Bank's website; and (b) at least seven distinct types of actions (i.e., "events") the user takes on TD Bank's website.

24.    With respect to the TD Bank customer's identity, the TD Bank discloses to Meta via the Facebook Tracking Pixel information captured by several different cookies that identify the individual TD Bank customer. For example:

a.    A "Facebook ID" is a unique and persistent numerical identifier—just like a social security number of driver's license number—that Meta assigns to each Facebook user and that: (a) Meta can use to identify the specific individual associated with the Facebook ID; and, moreover, (b) anyone (not just Meta) can use to identify the specific individual by simply appending the Facebook ID to the end of https://facebook.com/[Facebook ID]. The information transmitted to Meta by TD Bank included both encrypted and unencrypted Facebook IDs of the TD Bank customer using the TD Bank website.

b.    In addition to customer's Facebook ID, TD Bank also disclosed to Meta other data (including data identifying the TD Bank customer's web browser) that Meta uses to identify the identity of the individual TD Bank customer using the TD Bank website.

25.     With respect to the actions the TD Bank customer takes on the TD Bank website, TD Bank discloses at least the following types of event data to Meta alongside the information identifying the specific TD Bank customer:

a.     The PageView event transmits the Uniform Resource Locator ("URL") accessed, which shows what webpage the visitor visited. The Pixel transmits the entire path to Facebook, which includes the page of the financial platform or credit application to which the consumer has navigated. For instance, during a credit card application, those pages include URLs that describe the page the visitor has visited, such as the application "landing" page, the "personalAPP/aboutYou" page, and the "personalAPP/howtoReachYou" page, among others.

b.     The AddtoCart and InitiateCheckout events transmit information showing the exact credit product (*e.g.*, TD "Double Up" credit card) that the consumer selected to apply for.

c.     Adobe Audience Manager sends web-based audiences to Facebook for targeting.  Adobe Audience Manager helps collect data from consumer interactions on websites, using "event calls." Such event calls include "click events" and "impression events." "A click event is when a user clicks or interacts with a Website element and an impression event is when a Website element is displayed to a user. Thus, Adobe Audience Manager is used to collect data such as gender, interests, housing type, location, promotion affinity, spending power, and more.

d. TD Bank also has other events installed on td.com, including events called "fy18projecteverests1tos26supp," "NewSuppression," "W1AAMSegmentTen," and "Complete Registration."

26. The data TD Bank discloses to Meta, jointly and independently, permit an ordinary person to identify the financial services the TD Bank customer viewed, interacted with and/or purchased on TD Bank's website.

27. TD Bank benefits from using the Pixel because the Pixel helps website owners and publishers, app developers and business partners, including advertisers and others integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services.

**C. The Information TD Bank Shared Is Protected Under The Gramm-Leach-Bliley Act & Related Regulations.**

28. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

29. TD Bank is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

30. Pursuant to the GLBA, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

31. Pursuant to the regulations implementing the GLBA:

a. "[n]onpublic personal information" means (i) "[p]ersonally identifiable financial information", and (ii) "[a]ny list, description, or other grouping of consumers (and publicly available information pertaining to them) that is

derived using any personally identifiable financial information that is not publicly available", 16 C.F.R. § 313.3(n); 12 CFR § 1016.3(p);

b.    "personally identifiable financial information," in turn, means "any information: (i) [a] consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution], (ii) [a]bout a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer, or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer," 16 C.F.R. § 313.3(o)(1); 12 CFR § 1016.3(q)(1); and

c.    specifically enumerated "examples" of types of information that qualifies as "personally identifiable financial information" include, among other things: (i) "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution," (ii) "[a]ny information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer," (iii) [a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account," and (iv) "[a]ny information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)," 16 C.F.R. § 313.3(o)(2); 12 CFR § 1016.3(q)(2).

32.     The information that TD Bank disclosed to Meta via the Facebook Tracking Pixel—including *e.g.*, the users' Facebook ID (which identified the user that was interacting with TD Bank's financial services platform), the URL of the pages visited (which disclosed the financial services the user was obtaining), the identification of financial products a user added to his or her "cart" (which also disclosed the financial services the user was obtaining), and the "clicks" the user made on TD Bank's website (which is information TD Bank obtained from the consumer in connection with providing financial products and services)—is "nonpublic personal information" under the GLBA and related regulations.

**D.     TD Bank's Disclosure Of Plaintiff's Nonpublic Personal Information Was Unlawful.**

33.     Pursuant to the regulations implementing the GLBA, financial institutions may not, directly or through an affiliate, disclose any "nonpublic personal information" about a consumer to a nonaffiliated third party unless, among other things: (a) the financial institution provides the consumer with a clear and conspicuous notice that accurately reflects the financial institution's privacy policies and practices; and (b) the consumer does not opt out of those data sharing practices and clear, conspicuous and accurate disclosure. 16 C.F.R. § 313.10(a)(1); 12 C.F.R. § 1016.10(a)(1).

34.     As noted above, the notice to consumers regarding the financial institution's privacy policies and practices must be "clear and conspicuous" and "accurately reflect[]" the financial institutions privacy policies and practices. 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. The notice must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information.

16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. The notice must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9.

35.    TD Bank fails to provide the required "clear and conspicuous" notice that "accurately reflects" its privacy policies and practices. In fact, TD Bank's notice to consumers regarding its data sharing practices *falsely* states that: "The TD Bank Companies do not share [customers' personal information] with nonaffiliates so they can market to you." This statement is false because TD Bank *does* share customers' personal information with Meta so that TD Bank can market to consumers. Within the meaning of the GLBA and related regulations, Meta is not an affiliate of TD Bank and is otherwise a nonaffiliate of TD Bank. Because the Privacy Notice does not comply with applicable regulations described above, TD Bank was prohibited from disclosing its customers' nonpublic personal information collected through the Facebook Tracking Pixel, and those disclosures were unlawful under the GLBA and related regulations.

36.    By disclosing Plaintiff's and class members' nonpublic personal information to Meta without the required notice, TD Bank violated 16 C.F.R. § 313 (the "GLBA Privacy Rule") and 12 C.F.R. § 1016 ("Regulation P").

**E.    TD Bank's Conduct Was "Unfair" Under The Federal Trade Commission Act.**

37.    The GLBA "Privacy Rule" became effective on July 1, 2001. 16 C.F.R. § 313.

38.    The Federal Trade Commission ("FTC") has interpreted Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule.

39.    Failing to comply with the GLBA Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.

## CLASS ACTION ALLEGATIONS

40.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff

seeks certification of the following classes:

> **Nationwide Class:** All persons in the United States who, within the applicable limitations period, (1) had a Facebook account; and (2) interacted with TD Bank's online financial platform at TD.com within the authenticated TD Bank financial platform.

> **New York Subclass:** All persons in New York who, within the applicable limitations period, (1) had a Facebook account; and (2) interacted with TD Bank's online financial platform at TD.com within the authenticated TD Bank financial platform.

> **Multistate Subclass:** All persons in Connecticut, Delaware, Massachusetts, New Jersey, New York, and Vermont who, within the applicable limitations period, (1) had a Facebook account; and (2) interacted with TD Bank's online financial platform at TD.com within the authenticated TD Bank financial platform.

Excluded from the classes are (a) Defendant, (b) any entity in which any Defendant has a controlling interest, (c) Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns, and (d) any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

41.     Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

42.     Each of the proposed classes meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

43.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Nationwide Class and each State Subclass are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiff at this time, Plaintiff believes that there are millions of members of the Class dispersed

throughout the United States. Those persons' names and addresses are available from TD Bank's records and in data maintained by TD Bank and Meta, and class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

44.    **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

a. whether Defendant disclosed Class members' nonpublic personal information to Meta;

b. whether Class members consented to Defendant's disclosure of their nonpublic personal information; and

a. Whether Defendant owed duties to Plaintiff and class members to protect their nonpublic personal information;

b. Whether Defendant breached its duty to protect Plaintiff's and class members' nonpublic personal information;

c. Whether Defendant's disclosure of Plaintiff's and class members' nonpublic personal information to third-parties violated federal, state and local laws, or industry standards;

d. Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiff's and class members' nonpublic personal information;

e. Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiff's and class members' nonpublic personal information;

f.    Whether Defendant has a contractual obligation to protect Plaintiff's and class members' nonpublic personal information and whether it complied with such contractual obligation;

g.    Whether Defendant's conduct amounted to violations of state consumer protection statutes;

h.    Whether Defendant should retain Plaintiff's and class members' valuable nonpublic personal information;

i.    Whether, as a result of Defendant's conduct, Plaintiff and class members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

45.    **Typicality. Fed. R. Civ. P. 23(a)(3).** As to the Nationwide Class and each State Subclass, Plaintiff's claims are typical of other class members' claims because Plaintiff and class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

46.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Classes because Plaintiff is a member of the Classes and is committed to pursuing this matter against Defendant to obtain relief for the Classes. Plaintiff has no conflicts of interest with the Classes. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of all of the Classes.

47.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The

purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual Plaintiff and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

48.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole.

49.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

50.    Finally, all members of the proposed Classes are readily ascertainable. TD Bank has access to information regarding the identity of the individuals affected by the disclosure of their nonpublic personal information. Using this information, the members of the Classes can be identified and their contact information ascertained for purposes of providing notice to the Classes.

<u>**COUNT 1**</u>
<u>**NEGLIGENCE**</u>
<u>On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses</u>

51.     Plaintiff repeats and alleges Paragraphs 1–39, as if fully alleged herein.

52.     Plaintiff and class members submitted sensitive nonpublic personal information, including personally identifiable financial information, when accessing TD Bank's online financial platform.

53.     By collecting, storing, using, and profiting from this data, TD Bank had a duty of care to Plaintiff and class members to exercise reasonable care in keeping their nonpublic personal information, including personally identifiable financial information, confidential.

54.     TD Bank had common law duties to prevent foreseeable harm to Plaintiff and class members. These duties existed because Plaintiff and class members were the foreseeable and probable victims of any disclosure of their nonpublic personal information, including personally identifiable financial information, without their consent.

55.     Defendant's duties to protect the confidentiality of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and class members, on the other hand. The special relationship arose because Plaintiff and class members entrusted Defendant with their nonpublic personal information, including personally identifiable financial information, in connection with using Defendant's financial services. Defendant alone could have ensured that it did not disclose the nonpublic personal information, including personally identifiable financial information, without its consumers' consent.

56.     Defendant's duties to keep the nonpublic personal information, including personally identifiable financial information, confidential also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting

commerce," including the unfair practice of failing to keep the nonpublic personal information confidential.

57.     TD Bank's duty to keep nonpublic personal information, including personally identifiable financial information, confidential also arose under the GLBA, under which TD Bank was required to keep nonpublic personal information, including personally identifiable financial information, confidential.

58.     Defendant knew or should have known that by integrating the tracking technologies like the Facebook Tracking Pixel on TD.com that Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, would be disclosed to Meta.

59.     Defendant breached the duties it owed to Plaintiff and class members described above and was thus negligent. Defendant breached these duties by, among other things, installing the Facebook Tracking Pixel on its website, and configuring the Facebook Tracking Pixel in such a way that it systematically disclosed Defendant's customers nonpublic personal information, including personally identifiable financial information, to an unaffiliated third party.

60.     But for Defendant's wrongful and negligent breach of the duties it owed to Plaintiff and class members, their nonpublic personal information, including personally identifiable financial information, would not have been disclosed without their consent.

61.     As a direct and proximate result of Defendant's negligence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial.

62.     Plaintiff and class members seek to recover the value of the unauthorized access to their PII resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the

unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

<u>**COUNT 2**</u>
<u>**NEGLIGENCE *PER SE***</u>
<u>On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses</u>

63.    Plaintiff repeats and alleges Paragraphs 1–39, as if fully alleged herein.

64.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including the unfair act or practice by Defendant of failing to keep nonpublic personal information, including personally identifiable financial information, confidential.

65.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by disclosing its consumers' nonpublic personal information, including personally identifiable financial information, without notice and consent. Defendant's conduct was particularly unreasonable given the systematic nature of its collection and distribution of nonpublic personal information, including personally identifiable financial information, and the foreseeable consequences of disclosure of such information.

66.     TD Bank's duty to keep nonpublic personal information, including personally identifiable financial information, confidential also arose under the GLBA and related regulations (discussed above), under which TD Bank was required to keep its customers' nonpublic personal information, including personally identifiable financial information, confidential absent consent that TD Bank did not obtain.

67.     Defendant's violation of Section 5 of the FTC Act (and similar state statutes) and the GLBA (and related regulations) constitutes negligence *per se*.

68.     Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes), and the GLBA (and related regulations), were intended to protect.

69.     Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes), and the GLBA (and related regulations), were intended to guard against.

70.     As a direct and proximate result of TD Bank's negligence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial.

71.     Plaintiff and class members seek to recover the value of the unauthorized access to their PII resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common

law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

### COUNT 3
### UNJUST ENRICHMENT
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

72.     Plaintiff repeats and alleges Paragraphs 1–39, as if fully alleged herein.

73.     Plaintiff and class members have an interest, both equitable and legal, in the nonpublic personal information, including personally identifiable financial information, that was conferred upon, collected by, and maintained by Defendant and that was ultimately disclosed without their consent.

74.     Defendant benefitted by its collection and improper disclosure of the nonpublic personal information, including personally identifiable financial information, pertaining to Plaintiff and class members and by its ability to retain, use, and profit from that information. Defendant understood that it was in fact so benefitted.

75.     Defendant also understood and appreciated that the nonpublic personal information, including personally identifiable financial information, was private and confidential and that the information was valuable.

76.     But for Defendant's willingness and commitment to maintain its privacy and confidentiality, the nonpublic personal information, including personally identifiable financial information, would not have been transferred to and entrusted with Defendant and/or Plaintiff and class members would not have interacted with TD Bank's online financial platform.

77. Defendant continues to benefit and profit from its retention and use of the nonpublic personal information, including personally identifiable financial information, while its value to Plaintiff and class members has been diminished.

78. It is inequitable for Defendant to retain these benefits.

79. As a result of Defendant's wrongful conduct as alleged in this Complaint (including their knowing disclosure of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, for marketing purposes that benefitted only Defendant) Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and class members.

80. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, while at the same time disclosing that information to unaffiliated third parties for pecuniary purposes without consent.

81. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits they received, and are still receiving, without justification, from Plaintiff and class members in an unfair and unconscionable manner. Defendant's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

82. The benefits conferred upon, received, and enjoyed by Defendant were not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

83. Plaintiff pleads this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for

damages or enters judgment on them in favor of the Defendants, Plaintiff's will have no adequate legal remedy. Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in her other causes of action, in the event that such causes of action do not succeed. Plaintiff and the other members of the Classes may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

84.    Defendant is therefore liable to Plaintiff and class members for restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of their wrongful conduct.

**85.**    Plaintiff and class members seek to recover the value of the unauthorized access to their PII resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and

(c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

## COUNT 4
## DECLARATORY JUDGMENT
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

86.    Plaintiff repeats and alleges Paragraphs 1–39, as if fully alleged herein.

87.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

88.    An actual controversy has arisen regarding TD Bank's present and prospective common law and other duties to keep its customers' nonpublic personal information, including personally identifiable financial information, confidential and whether Defendant is currently keeping that information confidential. Plaintiff remains a TD Bank consumer who needs to use the TD Bank website to manage his accounts and the financial services provided to him by TD Bank. Thus, Plaintiff thus remains at imminent risk that additional disclosure of his nonpublic personal information, including personally identifiable financial information, will occur in the future.

89.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant continues to owe a legal duty to secure consumers' nonpublic personal information, including personally identifiable financial information, under the common law, Section 5 of the FTC Act, the GLBA, and various state statutes;

      b.     Defendant continues to breach this legal duty by disclosing its consumers' nonpublic personal information, including personally identifiable financial information, to unaffiliated third parties.

90.     The Court also should issue corresponding prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including personally identifiable financial information, confidential consistent with law and industry standards.

91.     If an injunction is not issued, Plaintiff and class members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial, as the Facebook Tracking Pixel remains operative on Defendant's website to this day. If additional disclosure occurs, Plaintiff and class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

92.     The hardship to Plaintiff and class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if TD Bank continues to disclose its customers nonpublic personal information, including personally identifiable financial information, Plaintiff and class members will likely be subjected to the harms described herein. On the other hand, the cost to Defendant of complying with an injunction by keeping its customers' nonpublic personal information, including personally identifiable financial information, confidential is relatively minimal (for example, removing the Facebook Tracking Pixel and any similar tracking technologies from its website), and Defendant have a pre-existing legal obligation to do so.

93.     Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing additional unlawful disclosures

of nonpublic personal information, including personally identifiable financial information, by TD Bank, thus eliminating the additional injuries that would result to Plaintiff and the hundreds of thousands of consumers whose information has been and will continue to be disclosed.

**COUNT 5**
**BREACH OF CONFIDENCE**
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

94.     Plaintiff restates and realleges paragraphs 1–39, as if fully set forth herein.

95.     At all times during Plaintiff's and class members' interactions with TD Bank, TD Bank was fully aware of the confidential and sensitive nature of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information.

96.     As alleged herein and above, TD Bank's relationship with Plaintiff and class members was governed by terms and expectations that Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, would be collected, stored, and protected in confidence, and would not be disclosed to any third parties without notice and consent.

97.     Plaintiff and class members provided their nonpublic personal information, including personally identifiable financial information, with the explicit and implicit understandings that TD Bank would protect and not permit that information to be disseminated to unaffiliated third parties without notice and consent.

98.     TD Bank voluntarily received in confidence Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, with the understanding that and affirmative representation to customers that the information would not be disclosed or disseminated to unaffiliated third parties for marketing purposes.

99.     TD Bank disclosed Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, without notice and without their express permission.

100.    But for TD Bank's disclosure of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, in violation of the parties' understanding of confidence, their nonpublic personal information, including personally identifiable financial information, would not have been disclosed third parties without their consent.

101.    The injury and harm Plaintiff and class members suffered was the reasonably foreseeable result of TD Bank's nonconsensual disclosure of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information. TD Bank knew it was disclosing Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, to third parties without their consent—indeed, TD Bank's notice to its customers falsely stated that it would *not* make these disclosures.

102.    As a direct and proximate result of TD Bank's breaches of confidence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial.

<u>**COUNT 6**</u>
<u>**BREACH OF CONTRACT**</u>
<u>On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses</u>

103.    Plaintiff repeats and alleges Paragraphs 1–39, as if fully alleged herein.

104.    TD Bank's Privacy Notice (the "Notice") is an agreement between TD Bank and persons who provided TD Bank with their nonpublic personal information, including personally identifiable financial information, including Plaintiff and class members.

105.    TD Bank's Notice applies to customers, applicants, and former customers of TD Bank, and it details how TD Bank will both protect and use the nonpublic personal information,

including personally identifiable financial information, provided by customers and applicants of TD Bank's services.

106.     The Notice provides detailed information about what types of customer information will be shared and with what entities. The Notice promises that "The TD Bank Companies do not share [customers' personal information] with nonaffiliates so they can market to you."

107.     Plaintiff and class members, on the one hand, and TD Bank, on the other, formed a contract when Plaintiff and class members provided nonpublic personal information, including personally identifiable financial information, subject to the Notice.

108.     TD Bank breached its agreement with Plaintiff and class members by disclosing their nonpublic personal information, including personally identifiable financial information, to unaffiliated third parties for marketing purposes. Specifically, TD Bank disclosed that information to Meta, in violation of the Notice.

109.     As a direct and proximate result of these breaches of contract, Plaintiff and class members sustained actual losses and damages as described in detail above, including but not limited to that they did not get the benefit of the bargain for which they paid and were overcharged by TD Bank for its services.

### COUNT 7
### BREACH OF IMPLIED CONTRACT
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

110.     Plaintiff repeats and alleges Paragraphs 1–39, as if fully alleged herein, and assert this claim in the alternative to their breach of contract claim to the extent necessary.

111.     Plaintiff and class members also entered into an implied contract with TD Bank when they obtained services from TD Bank, or otherwise provided nonpublic personal information, including personally identifiable financial information, to TD Bank.

112.    As part of these transactions, TD Bank agreed to safeguard and protect the nonpublic personal information, including personally identifiable financial information, of Plaintiff and class members.

113.    Plaintiff and class members entered into implied contracts with the reasonable expectation that TD Bank would keep their nonpublic personal information, including personally identifiable financial information, confidential. Plaintiff and class members believed that TD Bank would use part of the monies paid to TD Bank under the implied contracts to keep their nonpublic personal information, including personally identifiable financial information, confidential.

114.    Plaintiff and class members would not have provided and entrusted their nonpublic personal information, including personally identifiable financial information, or would have paid less for TD Bank's services in the absence of the implied contract or implied terms between them and TD Bank. The safeguarding of the nonpublic personal information, including personally identifiable financial information, of Plaintiff and class members was critical to realize the intent of the parties.

115.    TD Bank breached its implied contracts with Plaintiff and class members to protect their nonpublic personal information, including personally identifiable financial information, when it disclosed that information to Meta.

116.    As a direct and proximate result of TD Bank's breach of implied contract, Plaintiff and class members sustained actual losses and damages as described in detail above, including that they did not get the benefit of the bargain for which they paid and were overcharged by TD Bank for its services.

**COUNT 8**
**NEW YORK GENERAL BUSINESS LAW,**
**N.Y. Gen. Bus. Law §§ 349,** *et seq.*
<u>On Behalf of Plaintiff and the New York Subclass</u>

117.    Plaintiff, individually and on behalf of the New York Subclass, repeats and alleges Paragraphs 1-39, as if fully alleged herein.

118.    TD Bank engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including:

a.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and New York Subclass members' nonpublic personal information, including personally identifiable financial information, including duties imposed by the GLBA and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the damage to Plaintiff's and class members;

b.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and New York Subclass members' nonpublic personal information, including personally identifiable financial information, including by keeping that information confidential and not disclosing it to unaffiliated third parties for marketing purposes;

c.    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and New York Subclass members' nonpublic personal information, including personally identifiable financial information, including duties imposed by the GLBA and FTC Act, 15 U.S.C. § 45;

d.    Omitting, suppressing, and concealing the material fact that it did not keep Plaintiff and New York Subclass members' nonpublic personal information, including personally identifiable financial information, confidential; and

e. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Subclass members' nonpublic personal information, including personally identifiable financial information, including the duties imposed by the GLBA and the FTC Act, 15 U.S.C. § 45.

119. Plaintiff and members of the New York Subclass were deceived in New York. They also transacted with TD Bank in New York by accessing TD Bank's website and related financial services (e.g., banking and applying for credit cards) from New York.

120. TD Bank's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of TD Bank to protect the confidentiality of consumers' Personal Information.

121. As a direct and proximate result of TD Bank's deceptive and unlawful acts and practices, Plaintiff and New York Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with TD Bank as they would not have paid TD Bank for goods and services or would have paid less for such goods and services but for TD Bank's violations alleged herein.

122. TD Bank's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the tens of thousands of New Yorkers affected by the disclosure of their nonpublic personal information, including personally identifiable financial information.

123. The above deceptive and unlawful practices and acts by TD Bank caused injury to Plaintiff and New York Subclass members that they could not reasonably avoid.

124.     Plaintiff and New York Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, restitution, injunctive relief, and attorney's fees and costs.

## COUNT 9
## MUTLTISTATE UNFAIR AND DECEPTIVE TRADE PRACTICES
### On Behalf of Plaintiff and the Multistate Subclass(es)

125.     Plaintiff, individually and on behalf of each State subclass, incorporates by reference the allegations in paragraphs 1 - 39.

126.     This claim is brought by Plaintiff, individually and on behalf of the Multistate Subclass, for violations of the following consumer-protection statutes:

      a.    Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a through 42-110q.

      b.    Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, §§ 2511 through 2527, 2580 through 2584.

      c.    Massachusetts Regulation of Business Practice and Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93A, §§ 1 through 11.

      d.    New Jersey, N.J. Stat. Ann. §§ 56:8-1 through 56:8-91.

      e.    N.Y. Gen. Bus. Law §§ 349, *et seq*

      f.    Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451 through 2480g.

127.     The acts, practices, misrepresentations and omissions by Defendant described above, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

128.     Defendant's acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived or unfairly damaged Plaintiff and members of the

Multistate Subclass. Defendant's conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

129.    Plaintiff and members of the Multistate Subclass have been injured and harmed by Defendant's conduct.

130.    Plaintiff, on behalf of himself and the other members of the Multistate Subclass, seeks monetary damages, treble damages, statutory damages, and such other and further relief as set forth in each of the above enumerated statutes.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

a.    For an Order certifying the Classes, as defined herein, and appointing Plaintiff and Plaintiff's Counsel to represent the Classes as alleged herein;

b.    For injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and class members, including but not limited to an order:

i.    Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    Requiring Defendant to protect all nonpublic personal information, including personally identifiable financial information, collected

through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

c.      For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined;

d.      For an award of statutory damages, trebeled, and punitive or exemplary damages, as allowed by law in an amount to be determined;

e.      For an award of restitution or disgorgement, in an amount to be determined;

f.      For an award of attorneys' fees costs and litigation expenses, as allowable by law;

g.      For prejudgment interest on all amounts awarded; and

h.      Such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and all others similarly situated, hereby demands a trial by jury on all issues so triable.

Dated:   August 6, 2024                     Respectfully submitted,

                                    _____/s/ James E. Cecchi_____
                                    James E. Cecchi
                                    **CARELLA BYRNE CECCHI**
                                    **BRODY & AGNELLO, P.C.**
                                    5 Becker Farm Road
                                    Roseland, NJ 07068
                                    Tel.: (973) 994-1700
                                    jcecchi@carellabyrne.com

                                    Eric S. Dwoskin (*pro hac vice forthcoming*)
                                    **DWOSKIN WASDIN LLP**
                                    433 Plaza Real, Suite 275
                                    Boca Raton, FL 33432

Tel.: (561) 849-8060
edwoskin@dwowas.com

Norman E. Siegel (*pro hac vice forthcoming*)
J. Austin Moore (*pro hac vice forthcoming*)
Kasey Youngentob (*pro hac vice forthcoming*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel.: (816) 714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com
youngentob@stuevesiegel.com

*Counsel for Plaintiff and the putative Class*