# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| JEFFREY STEVENS, *individually and on behalf of all others similarly situated*,<br><br>      Plaintiff,<br><br>    v.<br><br>TD BANK, N.A.,<br><br>      Defendant. | Civil No. 24-8311<br>(RMB/AMD)<br><br>**OPINION** |

**APPEARANCES**

CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.
James E. Cecchi
5 Becker Farm Road
Roseland, New Jersey 07068

    *Attorney for Plaintiff*

BROWN & CONNERY, LLP
Susan M. Leming
360 Haddon Avenue
Westmont, New Jersey 08108

    *Attorney for Defendant*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter comes before the Court upon the Motion to Dismiss by Defendant TD Bank, N.A. ("Defendant" or "TD") [Motion (Docket No. 18); Def.'s Br. (Docket No. 18-3)] seeking dismissal of the Complaint [Docket No. 1] by Plaintiff Jeffrey Stevens ("Plaintiff" or "Stevens"). Plaintiff has opposed the Motion. [Pl.'s Opp'n (Docket No. 19).] Defendant has filed a reply brief in further support of its Motion. [Def.'s Reply (Docket No. 26).] The parties have also exchanged letters regarding supplemental authority [Pl.'s Supp. Auth. Ltr. (Docket No. 27); Def.'s Supp. Auth. Ltr. (Docket No. 28)]. The Court has considered the parties' submissions without oral argument pursuant to Local Civil Rule 78.1(b). For the reasons set forth below, Defendant's Motion to Dismiss will be **GRANTED**. Plaintiff's claims will be **DISMISSED WITHOUT PREJUDICE** and with leave to amend.

## I. FACTUAL BACKGROUND

Plaintiff brings this putative nationwide class action against Defendant alleging that TD utilized certain third-party data tracking technology to improperly collect and disclose his and other customers' personal financial information to third parties, specifically Meta Platforms, Inc. ("Meta"), without notice or consent.

### A. Facebook Tracking Pixel Technology

TD operates an online financial services platform at www.td.com, through which its customers can access account information and apply for financial products such as loans and credit cards. According to the Complaint, TD embedded a "hidden

tracking code" developed by Meta called the Facebook Tracking Pixel (the "Pixel") into its website. [Compl. ¶ 3.] The Pixel is a piece of code created by Meta that advertisers like TD can integrate into their websites. [*Id.* ¶ 16.] The Pixel's tracking technology can capture information about users' interactions with the website, including when logged into secure, authenticated portions of the platform. [*Id.* ¶¶ 4, 17.] Specifically, Stevens alleges that the Pixel transmits cookies and event data to Meta and that Meta, in turn, uses this information for marketing and advertising purposes. [*Id.* ¶¶ 4–5, 17.] Advertisers can control the type of data that the Pixel will collect and how the Pixel identifies website visitors. [*Id.* ¶¶ 18–19.]

When an individual visits TD's website while logged into Facebook, the Pixel will transmit the "c_user cookie," which contains the user's unencrypted Facebook ID, which corresponds to the user's Facebook profile, and the "fr" and "_fpb cookies" that also contain the user's unencrypted Facebook ID, as well as a browser identifier. [*Id.* ¶¶ 20–21.] TD also discloses to Meta via the Pixel data identifying the user's web browser, page URLs indicating financial products viewed or applied for, and behavioral data such as button clicks and form interactions. [*Id.* ¶¶ 24–25.] Stevens contends that this data permitted Meta to identify individual users as TD customers and to infer the financial services they used or explored. [*Id.* ¶¶ 23–27, 32; *see also* Pl.'s Opp'n at 3.]

TD allegedly disclosed this information to Meta to improve its marketing efforts, including by enabling Meta to generate "custom audiences" for targeted advertising and to refine its own ad-serving algorithms. [Compl. ¶¶ 3, 22.] According

3

to Stevens, TD profited from Meta's use of the disclosed data to optimize advertising, while Meta separately benefitted by improving its own data assets and ad services. [*Id.* ¶¶ 15–16, 22, 27.]

B. **Plaintiff's Use of TD's Website**

Plaintiff is a TD customer living in New York and has accessed his TD account through the bank's website while logged into Facebook. [Compl. ¶ 12.] His "interactions with TD Bank's online financial platform were disclosed to third parties, including Meta" without his consent. [*Id.*] He does not, however, provide any information as to the nature of his interactions with TD's website or what products, if any, he viewed or applied for. Plaintiff claims that he would have used another bank that paid higher interest if he had known about TD's data sharing practices. [*Id.*]

C. **TD's Privacy Policies**

TD's website explains that TD "uses cookies and other tracking technologies to provide content and offers that may be relevant to you." *Personalization and Advertising Preferences*, TD Bank, https://www.td.com/us/en/personal-banking/online-advertising [https://perma.cc/5HYX-R2VL].[1] Users may opt out of certain data tracking and interest-based ads on the website. *Id.* TD discloses that it may collect information from users' devices including "browsing habits on online services

---

[1] The Court may properly consider the contents of TD's website, including TD's Privacy Notice because the Complaint expressly relies upon them. *See Melzer v. Johnson & Johnson Consumer Inc.*, Civ. A. No. 22-3149 (MAS)(RLS), 2023 WL 3098633, at *1 n.2 (D.N.J. Apr. 26, 2023).

provided by us or third parties, such as search terms you entered on our websites, what websites and pages you visit, how long you stay and what actions you take." *Important Information About Your Privacy*, TD Bank, https://www.td.com/us/en/personal-banking/privacy [https://perma.cc/PHH3-SFNJ] (click on "What Information We Collect"). TD's website further explains that:

> We may advertise our products and services and personalize content through online services offered by us, our affiliates and third parties that are not affiliated with us, by using cookies, the mobile advertising identifier of your device and other tracking technologies. Some of our advertising partners may collect data from your mobile device, such as your website and app browsing habits and your mobile advertising identifier, and use it for "online behavioral advertising" . . . .

*Id.* (click on "Online Advertising"). The website again discloses that users may opt out of the use of their information by TD's nonaffiliate ad partners. *Id.*

TD's Privacy Notice is publicly available on its website. *What Do The TD Bank Companies Do With Your Personal Information*, TD Bank, https://www.td.com/content/dam/tdb/document/pdf/personal-banking/privacy-shareinformation-en.pdf [https://perma.cc/6QBD-FRSM]. It states that the "TD Bank Companies do not share [customer's personal information] with nonaffiliates so they can market to you." [Compl. ¶ 35; Privacy Notice at 2.] The Privacy Notice also discloses that TD shares customer's personal information for its own "marketing purposes – to offer [TD's] products and services to [the customer]." [Privacy Notice at 1.]

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on August 6, 2024 by filing a Class Action Complaint against Defendant on behalf of himself and all individuals similarly situated. Plaintiff seeks to represent a nationwide class of TD customers, as well as subclasses of residents of New York and five other states. [Compl. ¶ 40.] He asserts the following claims: (1) negligence, (2) negligence *per se*, (3) unjust enrichment, (4) declaratory judgment, (5) breach of confidence, (6) breach of contract, (7) breach of implied contract, (8) violation of New York General Business Law § 349, and (9) unfair and deceptive trade practices under the laws of Connecticut, Delaware, Massachusetts, New Jersey, New York, and Vermont.

On November 15, 2024, TD moved to dismiss the Complaint in its entirety. The briefing is complete, and the motion is now ripe for decision.

## III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. Courts will dismiss a complaint under Rule 12(b)(6) if the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When reviewing a motion to dismiss, courts must accept the complaint's well pled factual allegations as true and afford the plaintiff "every favorable inference to be

6

drawn therefrom." *Malleus*, 641 F.3d at 563 (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992)).  Courts will not accept "legal conclusions" as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 663.  Courts may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

A district court's role in reviewing the sufficiency of a complaint is thus limited: the issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000).  "When presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016) (citation omitted).

## IV.   DISCUSSION

TD contends that the Complaint fails in its entirety because Plaintiff has not plausibly alleged that any protected personal financial information specific to him was disclosed to Meta.  While the Complaint includes generalized assertions about how the Pixel operates and what types of data it may collect in theory, TD argues that it lacks well-pleaded factual allegations connecting those disclosures to Plaintiff himself. In TD's view, this failure renders all of Plaintiff's claims facially implausible and subject to dismissal under Rule 12(b)(6).  And even assuming Plaintiff has sufficiently

7

alleged the disclosure of his protected personal financial information, TD argues that each of Plaintiff's claims is separately deficient and subject to dismissal. Because the Court agrees with Defendant's threshold argument, it does not address the bulk of TD's claim-specific arguments.[2]

### A. Disclosure of Personal Financial Information

Plaintiff alleges that TD's website incorporated the Pixel to collect information about website visitors and transmit that information to Meta and/or Facebook. Plaintiff alleges that TD's use of the Pixel caused the unlawful disclosure of "nonpublic personal information," including the fact that a person is a TD customer and the financial services he or she viewed or used. [Compl. ¶¶ 4, 32.] Plaintiff is not alone in his concerns. The use of the Pixel tracking technology is apparently widespread, as are the privacy concerns relating to its use. Indeed, a Pixel-specific body of case law is rapidly developing across the country. *See Santoro v. Tower Health*, 2024 WL 1773371, at *1 (E.D. Pa. Apr. 4, 2024) ("The plaintiffs' general concern is not

---

[2] The Court will, however, address Defendant's standing argument. TD's remaining challenges are to the sufficiency of the pleadings. Given that Plaintiff will have the opportunity to replead his claims, resolution of these arguments would be premature and contrary to the interest of conserving this Court's scarce judicial resources. Plaintiff will be permitted to amend the Complaint to adequately plead what specific personal information of his was shared by TD via the Pixel to Facebook or Meta. Plaintiff has also been made aware of Defendant's positions as to other possible deficiencies in the Complaint. Plaintiff's amended allegations may very well impact Defendant's claim-specific arguments. Should Defendant believe in good faith that the amended complaint remains deficient, it may raise its challenges to the amended complaint in compliance with this Court's Individual Rules and Procedures and the Federal Rules of Civil Procedure.

frivolous, and cases similar to this one may be found in district courts around the country.").

No doubt the Complaint describes the functionality of the Pixel in considerable detail. But Plaintiff's case cannot ride solely on the general or theoretical capabilities of the Pixel. The Pixel must have captured and disclosed *his* personal financial information to state a claim. In other words, Plaintiff must – but fails to – connect the Pixel's functionality in the abstract to him individually. Plaintiff merely alleges that he is a TD customer and that he accessed his TD account through TD's website while logged into his Facebook account. [Compl. ¶ 12.] Nowhere does he allege which pages *he* visited, what financial products *he* viewed or applied for, or what information *of his*—if any—was actually transmitted from his browser to Meta. There is no allegation that Meta received Plaintiff's Facebook ID, that any specific event occurred during his website session, that Meta was able to identify him as a TD customer, or that he received any targeted advertisements from third parties. Without this information, the Court cannot determine what information Stevens actually shared with TD or whether that information is legally protected. *Santoro*, 2024 WL 1773371, at *4. "The specifics are essential to convert a case like this from a law-school hypothetical to an actionable dispute." *Id.* at *1.

The cases relied upon by Plaintiff only reinforce this point. For example, Plaintiff relies heavily on the recent decision in *Shah v. Capital One Financial Corp.*, 768 F. Supp. 3d 1033 (N.D. Cal. 2025), for support. [*See* Pl.'s Supp. Auth. Ltr.] Like here, *Shah* involved the use of the Pixel and other third-party tracking tools.

9

Uncontroversially, the *Shah* court explained that "[p]laintiffs must allege in more than a conclusory manner that Defendant disclosed data to third parties." 768 F. Supp. 3d at 1045.  A review of the complaint in *Shah* shows that they had.  For example, the *Shah* plaintiffs alleged that they had applied for credit cards via defendant's website (and thus disclosed the various sensitive information required in a credit card application) and that certain plaintiffs were approved while others were denied.  *Shah* Compl. ¶¶ 146–51, 156–60, 165–67, 172–75, No. 3:24-cv-05985-TLT (N.D. Cal. Aug. 26, 2024), ECF No. 1.  The complaint also provided screenshots showing the exact data captured and disclosed by the Pixel when a user applied for a credit card on defendant's website.  *Id.* ¶ 64-70.  Finally, the *Shah* plaintiffs alleged that they began receiving targeted ads on Facebook shortly thereafter.  *Id.* ¶¶ 153–55, 162–63.

Based upon these allegations, the *Shah* court found that the plaintiffs had provided sufficiently detailed allegations regarding their specific interactions with the defendant's website and the nature of the personal information that they shared with the website to proceed past the pleadings stage. 768 F. Supp. 3d at 1045–46.  The court explained that plaintiffs had "allege[d] that they put their personal and financial information, including employment information, bank account information, citizenship status, and credit card preapproval or eligibility, into Defendant's website and then received third- and fourth-party advertisements." *Id.*

Similarly, in *Fan v. NBA Properties Inc.*, another case relied upon by Stevens, the court found that the plaintiff had alleged with sufficient detail that his own information had been captured and disclosed to Meta by the Pixel.  2024 WL 1297643,

at *2 (N.D. Cal. Mar. 26, 2024). The *Fan* complaint explains plaintiff's specific interactions with defendant's website, including watching video clips and purchasing an NFT. *Fan* Compl. ¶¶ 53, 55, No. 3:23-cv-05069-SI (N.D. Cal. Oct. 3, 2023), ECF No. 1. It further describes in depth, including the use of screenshots, the specific data that was transmitted to Meta via the Pixel when a user purchased an NFT on defendant's website, like the plaintiff had. *Id.* ¶¶ 32–50.

The allegations in *Kane v. University of Rochester*, also cited by the parties, included detailed information about what *plaintiffs themselves* had submitted to defendant's website, including their patient status, the type of medical treatment they sought, and their communications with their healthcare providers. *Kane* Compl. ¶¶ 17, 37, 52, 158–83, No. 6:23-cv-06027-MJP (W.D.N.Y. Apr. 21, 2023), ECF No. 8. The complaint then included screenshots of the websites visited by plaintiffs and the specific data collected by the Pixel. *Id.* ¶¶ 91–100. Based on these allegations, the court determined that plaintiffs' allegations were sufficient to establish that defendant had disclosed individually identifiable health information via the Pixel. 2024 WL 1178340, at *5–7 (W.D.N.Y. Mar. 19, 2024); *see also R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 891 (C.D. Cal. 2024) (claims adequately pled where plaintiffs provided "sufficient factual detail about the actions they took on Defendant's website"). *R.C.* involved the use of the Pixel on a pharmacy website. The complaint detailed the plaintiffs' interactions with the website, including the purchase of sensitive healthcare products that revealed their medical conditions, and alleged that they then received targeted ads on Facebook. *R.C.* Compl. ¶¶ 11–12, 40–41, 53–56, 182, 192, 195,

11

No. 5:23-cv-01933-SRM-SP (C.D. Cal. Dec. 8, 2023) [ECF No. 39]. The allegations in these cases are abundant, specific, and well-pled. They do not rely on generalities or hypotheticals alone.

Plaintiff's allegations here, on the other hand, fall short. Plaintiff improperly relies on the general functionality of the Pixel and its hypothetical capacity to transmit sensitive information. But "allegations of what a technology is merely capable of collecting do not equate to sufficient allegations of what that technology actually collected." *Hartley v. Urb. Outfitters, Inc.*, 740 F. Supp. 3d 410, 422 (E.D. Pa. 2024) (dismissing claims relating to "spy pixel" tracking tool for failure to allege injury in fact noting that plaintiff's allegations lacked "granularity" required).

And allegations regarding "a *hypothetical visitor*" to TD's website do not suffice. *Smart v. Main Line Health*, 2024 WL 2943760, at *3 (E.D. Pa. June 10, 2024) (emphasis in original). The Complaint must instead allege "what specific [legally]-protected information Plaintiff *himself* provided to Defendant via his browsing activity that was subsequently disclosed to Meta." *See id.* (emphasis in original); *accord Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1083–84 (W.D. Wash. 2024) (dismissing claims where "Plaintiff makes no allegations as to the type of information she provided to Defendant . . . or that Defendant transmitted Private Information *of hers* to third parties" and "Plaintiff provides no additional factual information tying her actual activities to the allegations made by the hypothetical purportedly demonstrating disclosure of Private Information.") (emphasis in original); *Santoro*, 2024 WL 1773371, at *4 (dismissing claims for failure to allege "specific examples of

what [legally protected] information from plaintiffs was transferred to Meta."); *B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056, 1064 (C.D. Cal. 2024) (dismissing claims where complaint included only "vague allegations about Plaintiffs and their experiences with Defendant" but was "replete with conjectures and hypothetical scenarios and patients."); *Doe v. Amgen, Inc.*, 2024 WL 575248, at *2 (C.D. Cal. Jan. 29, 2024) ("It is not enough for Plaintiff to plead conclusory allegations that Defendant violated her privacy without offering any facts that her information was collected and then improperly disclosed to unauthorized third parties."); *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, 2023 WL 7017734, at *3 (E.D. Pa. Oct. 10, 2023) (allegations regarding broad categories of data too vague to satisfy pleading requirements).

But the Complaint does not. While Plaintiff alleges that TD shared "personally identifiable records of TD Bank customers, such as Plaintiff and other class members," including "information the consumer provides to TD Bank," Plaintiff nowhere alleges what *he in fact* provided to TD. [Compl. ¶ 4.] He further avers that "Plaintiff's interactions with TD Bank's online financial platform were disclosed to third parties," but does not explain what those interactions were. [*Id.* ¶ 12.] Plaintiff explains what information the Pixel may capture when a hypothetical person uses TD's website, but provides no information from which the Court can infer that the Pixel actually captured *his* information. [*Id.* ¶¶ 24–25.] Plaintiff's contention that his "personal financial information" – with no further elaboration as to the nature of the information – is simply too conclusory to state a claim. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (allegation that "highly confidential information" was

13

unlawfully shared not entitled to assumption of truth because too conclusory). As currently pled, this case remains "a law-school hypothetical" rather than "an actionable dispute." *See Santoro*, 2024 WL 1773371, at *1.

In sum, each of Plaintiff's causes of action rests on the premise that TD wrongfully disclosed Plaintiff's personal financial information to a third party. Yet there are no well-pled allegations as to what personal financial information *belonging to Plaintiff* was allegedly improperly disclosed. Plaintiff's failure to "explain the nature of the personal [financial] information allegedly captured by Meta Pixel" is fatal to each of his claims. *See Santoro*, 2024 WL 1773371, at *1. Without well-pled factual allegations establishing that TD disclosed *Plaintiff's* personal financial information, Plaintiff cannot plead the necessary elements of his claims, such as a breach of duty, causation, injury, or deception. Accordingly, the Court will dismiss the Complaint in its entirety without prejudice on this ground.

### B. Multistate Unfair and Deceptive Trade Practices Claim

Defendant moves to dismiss Plaintiff's multistate unfair and deceptive trade practices claim (Count 9) for lack of standing. While the Court declines to address Defendant's claim-specific arguments as to the sufficiency of the pleadings at this time, the Court will resolve this standing argument at the outset. In the final count of his Complaint, Plaintiff asserts claims under the unfair and deceptive trade practices statutes of multiple states, purporting to represent a putative "Multistate Subclass" consisting of TD customers who are residents of Connecticut, Delaware, Massachusetts, New Jersey, New York, and Vermont. [Compl. ¶ 40.] But Plaintiff,

as a New York resident, lacks standing to assert claims under the laws of states in which he neither resides nor alleges any injury.

It is well established that a named plaintiff in a putative class action must establish standing for each claim he seeks to assert. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359–60 (3d Cir. 2015) ("In the context of a class action, Article III must be satisfied 'by at least one named plaintiff.'"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531–32 (3d Cir. 2004). This includes the requirement that the plaintiff allege a "concrete and particularized" injury that is "fairly traceable" to the conduct challenged under the specific law invoked. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Thus, "[a] plaintiff cannot assert a claim under the law of a state where he does not reside or did not suffer any injury." *In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 65–66 (D.C. Cir. 2019); *see also Snowdy v. Mercedes-Benz USA, LLC*, 2024 WL 1366446, at *13 (D.N.J. Apr. 1, 2024) (collecting cases dismissing multistate consumer protection claims where plaintiffs failed to allege injury in non-forum states). "The requirements for standing do not change in the class action context." *In re Horizon Healthcare servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017).

This Court recently reaffirmed this principle in *Serrano v. Campbell Soup Co.*, 2025 WL 926394, at *9–11 (D.N.J. Mar. 27, 2025). The *Serrano* plaintiffs, California residents, brought a class action in New Jersey alleging deceptive labeling of beverages. This Court dismissed the plaintiffs' claims under New Jersey law, emphasizing that

the plaintiffs lacked standing to assert claims under the laws of states where they neither resided nor suffered injury. *Id.* The Court explained:

> The fact that a suit is filed as a class action "adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"

*Id.* at *9 (quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975))).

Here, Plaintiff alleges that he is a resident of New York and interacted with TD's online platform from New York only. He alleges no facts indicating that he lived in, used TD's website in, conducted financial transactions in, or was harmed in any of the other five states listed in the Multistate Subclass definition. Simply put, Stevens cannot satisfy the injury in fact requirement for Article III standing under the laws of the states where he does not reside and where he has not been injured as he has not "suffered an invasion of a legally protected interest under those States' laws." *Id.* at *10.

Thus, as in *Serrano*, this Court "joins the many courts in this District that have dismissed state-law claims in putative class actions [for lack of Article III standing] where the named plaintiff neither resided in that State nor suffered an injury there." *Id.* at *9 (collecting cases). Plaintiff lacks standing to assert claims under the consumer protection laws of Connecticut, Delaware, Massachusetts, New Jersey, or Vermont. The multistate unfair and deceptive trade practices claims under these states' laws are

16

therefore dismissed without prejudice to renewal if a properly alleged representative from those jurisdictions is later added to the action.[3]

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED**. The Complaint is **DISMISSED WITHOUT PREJUDICE**. Plaintiff may submit an amended complaint that remedies the deficiencies identified herein within **thirty (30) days**. An accompanying Order shall issue on this date.

s/Renée Marie Bumb
RENÉE MARIE BUMB
Chief United States District Judge

DATED: June 27, 2025

---

[3] The Court will not wait to resolve standing until class certification, as suggested by Plaintiff. [Pl.'s Opp'n at 42–44.] "Why should [Defendant]—and an overburdened Court—be dragged into protracted [multistate] discovery for a class certification that may never come?" *Serrano*, 2025 WL 926394, at *10 (citing *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *10 (D.N.J. Oct. 20, 2011)). "*Neale* seems clear that courts must resolve the class representative's standing before class certification." *Id.* (citing *Neale*, 794 F.3d at 366 ("Before even getting to the point of class certification, . . . class representatives need to present a justiciable claim."); *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020) ("[I]f it is the *class representative* who presents a standing problem, then that standing issue must be addressed first, prior to deciding class certification." (emphases in original))). The Court sees "no practical benefit to waiting to decide standing until after a decision on class certification." *In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*, 2022 WL 736250, at *17 (D. Del. Mar. 11, 2022).