James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com

[*Additional Counsel Listed On Signature Page*]

*Counsel for Plaintiff and the putative Class*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JEFFREY STEVENS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TD Bank, N.A.,<br><br>Defendant. | Civil Action No. 1:24-cv-8311-RMB-AMD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Stevens ("Plaintiff"), on behalf of himself and all other similarly situated (the "Class Members"), brings this case against TD Bank, N.A. ("TD Bank" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## INTRODUCTION

1. This is a class action against TD Bank for violating Plaintiff's privacy rights under federal and state law by disclosing Plaintiff's and other consumers' personal financial information to third parties without consent.

2. TD Bank operates a website—td.com and tdbank.com—on which consumers can access their account information and apply for credit cards and other financial products. TD Bank tracks and records its customers' interaction with its website, including after its customers have logged in through its portal to access their confidential account information.

3. In addition to tracking and recording its customers' interactions with its website, TD Bank also incorporated a hidden tracking code created by third parties, including Meta Platforms, Inc. (f/k/a Facebook) ("Meta") and Google LLC, into its website. Meta's tracking code is referred to as the "Meta Tracking Pixel" or "Meta Pixel." The Meta Pixel and Google's tracking technology share customer interactions with TD Bank's website with Meta and Google, respectively. Meta uses the data shared by TD Bank to create custom audiences for TD Bank to use for marketing and to benefit Meta itself. Google uses the data shared by TD Bank to measure website performance and to power marketing.

4. The data TD Bank shares with Meta via the Meta Tracking Pixel and with Google via Google tracking technology includes time-stamped, personally identifiable records of TD Bank customers, such as Plaintiff and other class members, including among other things: (a) the fact that the individual is or has been one of TD Bank's customers or has obtained a financial product or service from TD Bank; and (b) information the consumer provides to TD Bank, including information related to an application to obtain a credit card or other financial product or service, and information TD Bank obtains in connection with servicing its customers' accounts.

5. Meta and Google combine this personal information with other information about each consumer gathered from other sources and use it for marketing and advertising purposes.

6. Under the Gramm–Leach–Bliley Act (GLBA), 15 U.S.C. §§ 6801, *et seq*., financial institutions, such as TD Bank, are prohibited from disclosing a consumer's "personally

identifiable financial information" without advance notification and opt-out rights. The GLBA defines "personally identifiable financial information" to include, among other things, (a) any information a consumer provides to a financial institution to obtain a financial products or service; (b) any information about a consumer resulting from any transaction involving a financial product or service; or (c) any information a financial institution otherwise obtains about a customer in connection with providing a financial product or service. The examples of "personally identifiable financial information" included in the GLBA are indistinguishable from the types of information TD Bank disclosed to Meta and Google, including, among other things: (a) "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution]"; (b) "[a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing a credit account; and (c) "any information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)."

7. TD Bank's practice of disclosing its customers' personal financial information to Meta and Google violated Plaintiff's and other class members' privacy rights under the GLBA. TD Bank's conduct also violated other related federal and state laws. Plaintiff brings this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) of the Class Action Fairness Act because: (1) there are 100 or more putative class members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest

and costs; and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different states.

9. Personal jurisdiction is appropriate because Defendant maintains its principal place of business in this District. Likewise, in accordance with 28 U.S.C. § 1391, venue is proper because Defendant is a resident of this District.

**DEFENDANT**

10. TD Bank has its principal place of business in Cherry Hill, New Jersey and is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A). It operates about 1,100 branches and 2,600 ATMs across the East Coast and calls itself "America's Most Convenient Bank."

11. TD Bank charges fees for its various banking products. It charges a $5 monthly maintenance fee for its TD Simple Savings accounts and charges a $15 monthly maintenance fee for its TD Signature Savings account.[1] Both account types offer well below industry average interest rates. For example, in June 2025, TD Simple Savings offers a 0.02% APY.[2] "The national average savings account yield is 0.56 percent APY, according to Bankrate's survey of institutions as of July 24, 2025."[3] It also charges a $15 monthly maintenance fee for TD Convenience Checking accounts and has historically paid no interest.[4] And TD Bank charges for various other services.[5]

---

[1] https://perma.cc/62XY-55DR
[2] *Id.*
[3] https://perma.cc/Z82Q-QGEG
[4] https://www.scribd.com/document/533180989/Convenience
[5] *See*, *e.g.*, https://www.td.com/content/dam/tdb/document/pdf/personal-banking/1-fees-en.pdf

## NAMED PLAINTIFF

12. Plaintiff Jeffrey Stevens is a resident of Brooklyn, New York, and a citizen of New York State. Plaintiff is a TD Bank customer and has had a TD Bank account during at least the last three years.

13. Plaintiff maintains two checking accounts with TD Bank. To access these accounts online, Plaintiff must authenticate his identity by entering his unique username and password through TD Bank's secure login portal.

14. During the past three years, Plaintiff has regularly accessed his TD Bank accounts through the bank's websites (td.com and tdbank.com) about once per month, and through TD Bank's mobile application multiple times per week. Each access required Plaintiff to log in using his confidential credentials.

15. Unlike someone merely browsing TD Bank's public website, Plaintiff's activities occurred after he entered his confidential username and password to access his private account information. This is the digital equivalent of TD Bank allowing Meta and Google to look over Plaintiff's shoulder while he reviewed his accounts in a private office.

16. During these authenticated sessions, Plaintiff engaged in the following specific banking activities, among others:

- Viewed his checking account balance and transaction history;
- Transferred funds between his TD Bank checking accounts;
- Verified receipt of direct deposits from his employer;
- Confirmed that scheduled payments had processed;
- Downloaded account statements; and
- Reviewed pending transactions and available balance information.

17. On February 5, 2024, Plaintiff visited TD Bank's website at checkingbonus.tdbank.com/Digital500.html to research two specific checking account products: TD Beyond Checking and TD Complete Checking. During this visit, Plaintiff reviewed the features, fees, and requirements for each account type.

18. Unbeknownst to Plaintiff, TD Bank had installed on its web-properties the Meta Pixel, an invisible tracking code, that automatically captured and transmitted Plaintiff's banking activities to Meta each time he accessed his accounts.

19. Through the Meta Pixel, TD Bank disclosed the following specific information about Plaintiff to Meta:

- The fact that Plaintiff holds accounts at TD Bank;
- The pages Plaintiff viewed within TD Bank's authenticated online banking portal;
- The specific banking functions Plaintiff used (account viewing, transfers, statement downloads);
- The financial products Plaintiff researched, including his February 5, 2024, review of TD Beyond Checking and TD Complete Checking accounts; and
- The frequency and timing of Plaintiff's access to his financial accounts.

20. TD Bank transmitted this information to Meta through at least five distinct tracking "events"—recorded actions that capture user behavior. Each event has a unique identifier:

- Complete Registration (Pixel ID: 210108822654293) - tracks when users successfully sign up for financial products
- PageView (Pixel ID: 482165982280379) - records which pages users visit

- Adobe Audience Manager Segment (Pixel ID: 753587888034357) - a tracking tool that collects data about website visitors including their demographics, interests, and spending patterns.[6]

21. TD Bank did not merely share anonymous banking data. Instead, TD Bank transmitted Plaintiff's information alongside unique digital identifiers called "cookies"—small files that act like digital name tags. Specifically, TD Bank shared Meta's "fr," "fbp," and "c_user" cookies that enabled Meta to link all of this financial data directly Plaintiff's individual Facebook profile.

22. Because Plaintiff maintained a Facebook account since 2005 and was often logged into Facebook while conducting online banking, Meta could match TD Bank's transmissions to Plaintiff's real identity, creating a detailed profile of his banking relationships and financial behavior. This two-way connection meant that Meta knew exactly who was performing each banking action.

23. TD Bank simultaneously disclosed Plaintiff's financial information to Google through separate tracking technology embedded throughout TD Bank's websites and online banking platform.

24. Through Google's tracking technology, TD Bank disclosed to Google:

- The fact that Plaintiff is a TD Bank customer;
- The specific web addresses (URLs) of pages Plaintiff accessed within TD Bank's authenticated portal;

[6] There are two other Pixel events that also transmitted data: fy18projecteverests1tos26supp (Pixel ID: 1539657062816299) and W1AAMSegmentTen (Pixel ID: 1618212651815802).

- Plaintiff's banking activities, including balance checks, transfers, and statement downloads;
- The financial products Plaintiff researched on February 5, 2024; and
- The timing and frequency of Plaintiff's banking sessions.

25. As with Meta, TD Bank transmitted unique identifiers alongside Plaintiff's banking data that enabled Google to associate this financial information with Plaintiff's individual Google account profile, which he maintained throughout the relevant period. Indeed, the February 5, 2024, data transmission is presently accessible to Plaintiff from his Google account, demonstrating that Google, in fact, linked Plaintiff's interactions with TD Bank to him personally using his Google ID.

26. Through these systematic disclosures, TD Bank provided Meta and Google with a comprehensive view of Plaintiff's financial life. As a result, Meta and Google now possess a detailed financial diary of Plaintiff's life.

27. Plaintiff never consented to TD Bank sharing any of his banking information with Meta or Google. Plaintiff reasonably expected that his activities within TD Bank's password-protected online banking portal would remain confidential between himself and his bank. Plaintiff would have used another bank that paid higher interest if he had known TD Bank would share his personal information with Meta and Google.

28. Plaintiff recalls that while he has banked online or with the mobile application with TD Bank that he has seen advertisements on Facebook related to financial products and services, including from TD Bank.

## FACTUAL ALLEGATIONS

### A. Meta and the Meta Tracking Pixel

29. Meta is the largest social networking site on the planet, touting 2.9 billion monthly active users. Meta describes itself as a "real identity platform," meaning users are allowed only one account and must share "the name they go by in everyday life." To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

30. Meta generates revenue by selling advertising space on its website.

31. Meta sells advertising space by highlighting its ability to target users. Meta can target users so effectively because it surveils user activity both on and off its site. This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections." Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.

32. Advertisers can also build "Custom Audiences." Custom Audiences enable advertisers to reach people who have already shown interest in their business, whether they're loyal customers or people who have used their app or visited their website. Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which leverages information such as demographics, interests, and behavior from a business's existing audience to find new people who share similar qualities. Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for customers, or by using Meta's "Business Tools," which collect and transmit the data automatically. One such Business Tool is the Meta Tracking Pixel.

33. The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. A related product called the Facebook SDK can be integrated into mobile applications, like TD Bank's. Once activated, the Meta Tracking Pixel tracks the people and type of actions they take. When the Meta Tracking Pixel captures an action, it sends a record to Meta. Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

34. Advertisers control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks. Advertisers can also configure the Meta Tracking Pixel to track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases. An advertiser can also create their own tracking parameters by building a "custom event."

35. Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers." HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website." As such, Meta captures full-string, detailed URLs disclosing website users' individualized website searches and queries, which includes a plain-language description of the search and queries that the user selected, as well as details about the search that are conveyed through other parameters.

36. When a user accesses td.com or tdbank.com while logged into Meta, the Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Meta ID. Meta IDs correspond to Meta profiles.

37. No matter the circumstances, Meta receives at least the fr and _fpb cookies from a visitor's browser when visiting td.com or tdbankcom. The fr cookie contains, at least, an encrypted Meta ID and browser identifier. The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. Meta, at a minimum, uses the fr and _fbp cookies to identify users.

38. The information Meta collects from the Meta Pixel is valuable to Meta (and TD Bank). Meta can use the information it collects to promote safety and security on and off the Meta products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta products. Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and use the Event Data for ads delivery after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta products. Further, Meta can use the event data to help websites like TD Bank's reach people with transactional and other commercial messages on Facebook Messenger and other Meta products. Finally, Meta can use the information it collects to personalize the features and content (including ads and recommendations) that Meta shows people on and off Meta products. Thus, the information is valuable to Meta for its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

**B. TD Bank's Website and the Meta Pixel**

39. TD Bank has integrated the Meta Tracking Pixel into td.com and tdbank.com, including into its financial platform and online credit application process, and it is configured to transmit to Meta: (a) information which identifies the specific consumer using TD Bank's website; and (b) at least seven distinct types of actions (i.e., "events") the user takes on TD Bank's website.

40. With respect to the TD Bank customer's identity, the TD Bank discloses to Meta via the Meta Tracking Pixel information captured by several different cookies that identify the individual TD Bank customer. For example:

a. A "Facebook ID" is a unique and persistent numerical identifier—just like a social security number or driver's license number—that Meta assigns to each Meta user and that: (a) Meta can use to identify the specific individual associated with the Facebook ID; and (b) anyone (not just Meta) can use to identify the specific individual by simply appending the Facebook ID to the end of https://facebook.com/[Facebook ID]. The information transmitted to Meta by TD Bank included both encrypted and unencrypted Facebook IDs of the TD Bank customer using the TD Bank website.

b. In addition to customer's Facebook ID, TD Bank also disclosed to Meta other data (including data identifying the TD Bank customer's web browser) that Meta uses to identify the identity of the individual TD Bank customer using the TD Bank website.

41. With respect to the actions the TD Bank customer takes on the TD Bank website, TD Bank discloses at least the following types of event data to Meta alongside the information identifying the specific TD Bank customer:

a. The PageView event transmits the Uniform Resource Locator ("URL") accessed, which shows what webpage the visitor visited. The Pixel transmits the entire path to Meta, which includes the page of the financial platform or credit application to which the consumer has navigated. For instance, during a credit card application, those pages include URLs that

describe the page the visitor has visited, such as the application "landing" page, the "personalAPP/aboutYou" page, and the "personalAPP/howtoReachYou" page, among others.

b. The AddtoCart and InitiateCheckout events transmit information showing the exact credit product (*e.g.*, TD "Double Up" credit card) that the consumer selected to apply for.

c. The Complete Registration event is used to track when a user has successfully completed a registration or signed up for a financial product or service.

d. Adobe Audience Manager sends web-based audiences to Meta for targeting. Adobe Audience Manager helps collect data from consumer interactions on websites, using "event calls." Such event calls include "click events" and "impression events." "A click event is when a user clicks or interacts with a Website element and an impression event is when a Website element is displayed to a user. Thus, Adobe Audience Manager is used to collect data such as gender, interests, housing type, location, promotion affinity, spending power, and more.

e. TD Bank also has other events installed on td.com and tdbank.com, including events called "fy18projecteverests1tos26supp," and "W1AAMSegmentTen."

42. The data TD Bank discloses to Meta, jointly and independently, permit an ordinary person to identify the financial services the TD Bank customer viewed, interacted with and/or purchased on TD Bank's website.

43. TD Bank benefits from using the Pixel because the Pixel helps website owners and publishers, app developers and business partners, including advertisers and others integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services.

**C. Google and Google Tracking Technology and TD Bank**

44. TD Bank deployed on its website trackers associated with "Google Analytics." According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business [es]." "To measure a website ... [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." Then, "[e]very time a user visits a webpage, the tracking code will collect ... information about how that user interacted with the page." This is done through "events" which "let [clients] measure ... when someone loads a page, clicks a link, [] makes a purchase[]" and more. Google provides a menu of "recommended events" (i.e., "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; "views their shopping cart") and also allows for "collect[ing] additional information that Google Analytics does not collect automatically[,]" through "custom events."

45. Across the website, Google's trackers capture full-string, detailed URLs disclosing website users' individualized website search terms and queries. Across the website, Google trackers capture users' button clicks (conveying responses to questions and prompts, conveying website users' respective desires that the website would supply them with certain information and/or responses, and conveying other selections).

46. Google associates the information through its trackers to the users' Google account.

**D. The Information TD Bank Shared Is Protected Under the Gramm-Leach-Bliley Act & Related Regulations.**

47. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

48. TD Bank is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

49. Pursuant to the GLBA, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

50. Pursuant to the regulations implementing the GLBA:

a. "[n]onpublic personal information" means (i) "[p]ersonally identifiable financial information", and (ii) "[a]ny list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available", 16 CFR § 313.3(n); 12 CFR § 1016.3(p);

b. "personally identifiable financial information," in turn, means "any information: (i) [a] consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution], (ii) [a]bout a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer, or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer," 16 CFR § 313.3(o)(1); 12 CFR § 1016.3(q)(1); and

c. specifically enumerated "examples" of types of information that qualifies as "personally identifiable financial information" include, among other things: (i) "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution," (ii) "[a]ny information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer," (iii) [a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account," and (iv) "[a]ny information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)," 16 CFR § 313.3(o)(2); 12 CFR § 1016.3(q)(2).

51. The information that TD Bank disclosed to Meta via the Meta Tracking Pixel—including *e.g.*, the users' Facebook ID (which identified the user that was interacting with TD Bank's financial services platform), the URL of the pages visited (which disclosed the financial services the user was obtaining), the identification of financial products a user added to his or her "cart" (which also disclosed the financial services the user was obtaining), and the "clicks" the user made on TD Bank's website (which is information TD Bank obtained from the consumer in connection with providing financial products and services)—is "nonpublic personal information" under the GLBA and related regulations.

52. The information that TD Bank disclosed to Google via the Google tracking technologies—including *e.g.*, the unique identifiers that Google uses to associate event data with

a particular user, the URL of the pages visited (which disclosed the financial services the user was obtaining) and the "clicks" the user made on TD Bank's website (which is information TD Bank obtained from the consumer in connection with providing financial products and services)—is "nonpublic personal information" under the GLBA and related regulations.

**E. TD Bank's Disclosure of Plaintiff's Nonpublic Personal Information Was Unlawful.**

53. Pursuant to the regulations implementing the GLBA, financial institutions may not, directly or through an affiliate, disclose any "nonpublic personal information" about a consumer to a nonaffiliated third party unless, among other things: (a) the financial institution provides the consumer with a clear and conspicuous notice that accurately reflects the financial institution's privacy policies and practices; and (b) the consumer does not opt out of those data sharing practices and clear, conspicuous and accurate disclosure. 16 CFR § 313.10(a)(1); 12 CFR § 1016.10(a)(1).

54. As noted above, the notice to consumers regarding the financial institution's privacy policies and practices must be "clear and conspicuous" and "accurately reflect[]" the financial institutions privacy policies and practices. 16 CFR §§ 313.4 and 313.5; 12 CFR §§ 1016.4 and 1016.5. The notice must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 CFR § 313.6; 12 CFR § 1016.6. The notice must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 CFR § 313.9; 12 CFR § 1016.9.

55. TD Bank fails to provide the required "clear and conspicuous" notice that "accurately reflects" its privacy policies and practices. In fact, TD Bank's notice to consumers regarding its data sharing practices *falsely* states that: "The TD Bank Companies do not share

[customers' personal information] with nonaffiliates so they can market to you." This statement is false because TD Bank *does* share customers' personal information with Meta so that TD Bank can market to consumers. Within the meaning of the GLBA and related regulations, Meta is not an affiliate of TD Bank and is otherwise a nonaffiliate of TD Bank. Within the meaning of the GLBA and related regulations, Google is not an affiliate of TD Bank and is otherwise a nonaffiliate of TD Bank. Because the Privacy Notice does not comply with applicable regulations described above, TD Bank was prohibited from disclosing its customers' nonpublic personal information collected through the Meta Tracking Pixel and Google tracking technologies, and those disclosures were unlawful under the GLBA and related regulations.

56. By disclosing Plaintiff's and class members' nonpublic personal information to Meta and Google without the required notice, TD Bank violated 16 CFR § 313 (the "GLBA Privacy Rule") and 12 CFR § 1016 ("Regulation P").

**F. TD Bank's Conduct Was "Unfair" Under The Federal Trade Commission Act.**

57. The GLBA "Privacy Rule" became effective on July 1, 2001. 16 CFR § 313.

58. The Federal Trade Commission ("FTC") has interpreted Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule.

59. Failing to comply with the GLBA Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.

## CLASS ACTION ALLEGATIONS

60. Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of the following classes:

> **Nationwide Class:** All persons in the United States who, within the applicable limitations period, interacted with TD Bank's online

> financial platform at td.com or tdbank.com and whose personally identifiable financial information was disclosed to one or more third-parties.
>
> **New York Subclass:** All persons in New York who, within the applicable limitations period, interacted with TD Bank's online financial platform at td.com or tdbank.com and whose personally identifiable financial information was disclosed to one or more third-parties.

Excluded from the classes are (a) Defendant, (b) any entity in which any Defendant has a controlling interest, (c) Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns, and (d) any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

61. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

62. Each of the proposed classes meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

63. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Nationwide Class and each State Subclass are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiff at this time, Plaintiff believes that there are millions of members of the Class dispersed throughout the United States. Those persons' names and addresses are available from TD Bank's records and in data maintained by TD Bank, Meta, and Google and class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

64. **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves

common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

a. whether Defendant disclosed Class members' nonpublic personal information to Meta and/or Google;

b. whether Class members consented to Defendant's disclosure of their nonpublic personal information; and

c. Whether Defendant owed duties to Plaintiff and class members to protect their nonpublic personal information;

d. Whether Defendant breached its duty to protect Plaintiff's and class members' nonpublic personal information;

e. Whether Defendant's disclosure of Plaintiff's and class members' nonpublic personal information to third-parties violated federal, state and local laws, or industry standards;

f. Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiff's and class members' nonpublic personal information;

g. Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiff's and class members' nonpublic personal information;

h. Whether Defendant has a contractual obligation to protect Plaintiff's and class members' nonpublic personal information and whether it complied with such contractual obligation;

i. Whether Defendant's conduct violated state consumer protection statutes;

j. Whether Defendant should retain Plaintiff's and class members' valuable nonpublic personal information;

k. Whether, as a result of Defendant's conduct, Plaintiff and class members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

65. **Typicality. Fed. R. Civ. P. 23(a)(3).** As to the Nationwide Class and each State Subclass, Plaintiff's claims are typical of other class members' claims because Plaintiff and class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

66. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Classes because Plaintiff is a member of the Classes and is committed to pursuing this matter against Defendant to obtain relief for the Classes. Plaintiff has no conflicts of interest with the Classes. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of all of the Classes.

67. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual Plaintiff and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the class members are small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all

parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

68. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive and declaratory relief appropriate to the Classes as a whole.

69. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

70. Finally, all members of the proposed Classes are readily ascertainable. TD Bank has access to information regarding the identity of the individuals affected by the disclosure of their nonpublic personal information. Using this information, the members of the Classes can be identified and their contact information ascertained for purposes of providing notice to the Classes.

## COUNT 1
## NEGLIGENCE
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

71. Plaintiff repeats and alleges Paragraphs 1–70, as if fully alleged herein.

72. Plaintiff and class members submitted sensitive nonpublic personal information, including personally identifiable financial information, when accessing TD Bank's online financial platform.

73. By collecting, storing, using, and profiting from this data, TD Bank had a duty of care to Plaintiff and class members to exercise reasonable care in keeping their nonpublic personal information, including personally identifiable financial information, confidential.

74. TD Bank had common law duties to prevent foreseeable harm to Plaintiff and class members. These duties existed because Plaintiff and class members were the foreseeable and probable victims of any disclosure of their nonpublic personal information, including personally identifiable financial information, without their consent.

75. Defendant's duties to protect the confidentiality of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and class members, on the other hand. The special relationship arose because Plaintiff and class members entrusted Defendant with their nonpublic personal information, including personally identifiable financial information, in connection with using Defendant's financial services. Defendant alone could have ensured that it did not disclose the nonpublic personal information, including personally identifiable financial information, without its consumers' consent.

76. Defendant's duties to keep the nonpublic personal information, including personally identifiable financial information, confidential also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including the unfair practice of failing to keep the nonpublic personal information confidential.

77. TD Bank's duty to keep nonpublic personal information, including personally identifiable financial information, confidential also arose under the GLBA, under which TD Bank was required to keep nonpublic personal information, including personally identifiable financial information, confidential. The violation of this duty constitutes negligence per se.

78. Defendant knew or should have known that by integrating the tracking technologies like the Meta Tracking Pixel and the Google tracking technologies on TD.com and tdbank.com that

Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, would be disclosed to Meta and Google.

79. Defendant breached the duties it owed to Plaintiff and class members described above and was thus negligent. Defendant breached these duties by, among other things, installing the Meta Tracking Pixel and the Google tracking technologies on its website, and configuring the Meta Tracking Pixel and Google tracking technologies in such a way that it systematically disclosed Defendant's customers nonpublic personal information, including personally identifiable financial information, to an unaffiliated third party.

80. But for Defendant's wrongful and negligent breach of the duties it owed to Plaintiff and class members, their nonpublic personal information, including personally identifiable financial information, would not have been disclosed without their consent.

81. As a direct and proximate result of Defendant's negligence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial.

82. Plaintiff and class members seek to recover the value of the unauthorized access to their PII resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as with a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law

damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence about the value of similar transactions.

**COUNT 2**
**BREACH OF CONFIDENCE**
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

83. Plaintiff restates and realleges paragraphs 1–70, as if fully set forth herein.

84. At all times during Plaintiff's and class members' interactions with TD Bank, TD Bank was fully aware of the confidential and sensitive nature of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information.

85. As alleged herein and above, TD Bank's relationship with Plaintiff and class members was governed by terms and expectations that Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, would be collected, stored, and protected in confidence, and would not be disclosed to any third parties without notice and consent.

86. Plaintiff and class members provided their nonpublic personal information, including personally identifiable financial information, with the explicit and implicit understandings that TD Bank would protect and not permit that information to be disseminated to unaffiliated third parties without notice and consent.

87. TD Bank voluntarily received in confidence Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, with the

understanding that and affirmative representation to customers that the information would not be disclosed or disseminated to unaffiliated third parties for marketing purposes.

88. TD Bank disclosed Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, without notice and without their express permission.

89. But for TD Bank's disclosure of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, in violation of the parties' understanding of confidence, their nonpublic personal information, including personally identifiable financial information, would not have been disclosed third parties without their consent.

90. The injury and harm Plaintiff and class members suffered was the reasonably foreseeable result of TD Bank's nonconsensual disclosure of Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information. TD Bank knew it was disclosing Plaintiff's and class members' nonpublic personal information, including personally identifiable financial information, to third parties without their consent—indeed, TD Bank's notice to its customers falsely stated that it would *not* make these disclosures.

91. As a direct and proximate result of TD Bank's breaches of confidence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial.

**COUNT 3**
**BREACH OF CONTRACT**
On Behalf of Plaintiff and the Nationwide Class, or Alternatively, on Behalf of Plaintiff and the State Subclasses

92. Plaintiff repeats and alleges Paragraphs 1–70, as if fully alleged herein.

93. Plaintiff's use of the website required him to agree to TD Bank's Digital Platforms Terms of Use, which "constitute[d] an agreement between any person who accesses or uses the Digital Platforms . . . and TD."[7]

94. Those terms provided that his "use of the Digital Platforms, and [TD's] collection and use of [his] information, [was] subject to [TD's] Online Privacy Code and Privacy Notice(s) provided on the Digital Platforms."[8]

95. Plaintiff provided personal information in exchange for using its website and receiving its financial services subject to TD's Privacy Notice (the "Notice").

96. TD Bank's Notice applies to customers, applicants, and former customers of TD Bank, and it details how TD Bank will both protect and use the nonpublic personal information, including personally identifiable financial information, provided by customers and applicants of TD Bank's services.

97. The Notice provides detailed information about what types of customer information will be shared and with what entities. The Notice promises that "The TD Bank Companies do not share [customers' personal information] with nonaffiliates so they can market to you."

98. Plaintiff and class members, on the one hand, and TD Bank, on the other, formed a contract when Plaintiff and class members provided nonpublic personal information, including personally identifiable financial information, subject to the Notice.

99. TD Bank breached its agreement with Plaintiff and class members by disclosing their nonpublic personal information, including personally identifiable financial information, to

[7] TD Bank, Digital Platforms Terms of Use (2024), https://www.td.com/content/dam/tdb/document/pdf/personal-banking/td-website-terms-of-use-en.pdf.

[8] *Id.*

unaffiliated third parties for marketing purposes. Specifically, TD Bank disclosed that information to Meta and Google, in violation of the Notice.

100. As a direct and proximate result of these breaches of contract, Plaintiff and class members sustained actual losses and damages as explained above, including, but not limited to, that they did not get the benefit of the bargain for which they paid and were overcharged by TD Bank for its services.

**COUNT 4**
**NEW YORK GENERAL BUSINESS LAW,**
**N.Y. Gen. Bus. Law §§ 349, *et seq*.**
On Behalf of Plaintiff and the New York Subclass

101. Plaintiff, individually and on behalf of the New York Subclass, repeats and alleges Paragraphs 1–70, as if fully alleged herein.

102. TD Bank engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including:

a. Failing to comply with common law and statutory duties relating to the security and privacy of Plaintiff and New York Subclass members' nonpublic personal information, including personally identifiable financial information, including duties imposed by the GLBA and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the damage to Plaintiff's and class members;

b. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and New York Subclass members' nonpublic personal information, including personally identifiable financial information, including by keeping that information confidential and not disclosing it to unaffiliated third parties for marketing purposes;

c. Misrepresenting that it would comply with common law and statutory duties relating to the security and privacy of Plaintiff and New York Subclass members' nonpublic personal information, including personally identifiable financial information, including duties imposed by the GLBA and FTC Act, 15 U.S.C. § 45;

d. Omitting, suppressing, and concealing the material fact that it did not keep Plaintiff and New York Subclass members' nonpublic personal information, including personally identifiable financial information, confidential; and

e. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties relating to the security and privacy of Plaintiff and Subclass members' nonpublic personal information, including personally identifiable financial information, including the duties imposed by the GLBA and the FTC Act, 15 U.S.C. § 45.

103. Plaintiff and members of the New York Subclass were deceived in New York. They also transacted with TD Bank in New York by accessing TD Bank's website and related financial services (e.g., banking and applying for credit cards) from New York.

104. TD Bank's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of TD Bank to protect the confidentiality of consumers' Personal Information.

105. As a direct and proximate result of TD Bank's deceptive and unlawful acts and practices, Plaintiff and New York Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with TD Bank as they would not have paid TD Bank

for goods and services or would have paid less for such goods and services but for TD Bank's violations alleged herein.

106. TD Bank's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the tens of thousands of New Yorkers affected by the disclosure of their nonpublic personal information, including personally identifiable financial information.

107. The above deceptive and unlawful practices and acts by TD Bank caused injury to Plaintiff and New York Subclass members that they could not reasonably avoid.

108. Plaintiff and New York Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, restitution, injunctive relief, and attorney's fees and costs.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

a. For an Order certifying the Classes, as defined here, and appointing Plaintiff and Plaintiff's Counsel to represent the Classes as alleged herein;

b. For injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and class members, including, but not limited to, an order:

i. Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. Requiring Defendant to protect all nonpublic personal information, including personally identifiable financial information, collected

through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

c. For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined;

d. For an award of statutory damages, trebled, and punitive or exemplary damages, as allowed by law in an amount to be determined;

e. For an award of restitution or disgorgement, in an amount to be determined;

f. For an award of attorneys' fees costs and litigation expenses, as allowable by law;

g. For prejudgment interest on all amounts awarded; and

h. Such other and further relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiff, on behalf of himself and all others similarly situated, hereby demands a trial by jury on all issues so triable.

Dated: October 29, 2025

Respectfully submitted,

*/s/ James E. Cecchi*

James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Tel.: (973) 994-1700
jcecchi@carellabyrne.com

Eric S. Dwoskin (*pro hac vice*)
**DWOSKIN WASDIN LLP**
433 Plaza Real, Suite 275
Boca Raton, FL 33432

Tel.: (561) 849-8060
edwoskin@dwowas.com

Norman E. Siegel (*pro hac vice forthcoming*)
J. Austin Moore (*pro hac vice forthcoming*)
Kasey Youngentob (*pro hac vice forthcoming*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel.: (816) 714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com
youngentob@stuevesiegel.com

*Counsel for Plaintiff and the putative Class*